## THE REGULUS.

*(Circuit Court, S. D. New York. January 6, 1885.)*

1. CARRIERS BY WATER — SEAWORTHINESS — CHARTER-PARTY — OVERLOADING FRUIT CARGO—VENTILATION—PROXIMATE CAUSE OF INJURY.

Where a vessel was chartered to take a specified cargo of fruit, after loading with other cargo, and the contract contained a clause that the hatches should be taken off, "whenever practicable, as usual, for the ventilation of green fruit," and the master overloaded the ship, in consequence of which the hatches could not be removed, as usual, on the vovage, *held:* (1) that the charter-party obligated the ship to furnish the usual ventilation for a cargo of fruit, to the extent of which her ordinary facilities would permit, in view of the perils of the voyage; (2) that there was a breach of this obligation by overloading the ship so that it was not practicable to open the hatches as usual; (3) that the charterer was entitled to rely upon the contract, and was not precluded from recovering, because he had reason to apprehend when he delivered his cargo that the ship would be overloaded.

2. SAME—DECREE AFFIRMED.

Upon examination of the evidence, the decree of the district court (18 FED. REP. 380) in favor of libelant is affirmed, with costs.

In Admiralty.

*Goodrich, Deady & Platt,* for claimant and appellant.

*Wm. A. Walker,* for libelant and appellee.   *Geo. A. Black,* of counsel.

WALLACE, J.   The libel is filed to recover damages for the loss upon a cargo of oranges received by the steam-ship at Valencia, Spain, in January, 1881, to be transported to the city of New York.   The Regulus sailed from Valencia, January 7th, and arrived in New York, February 9th, with the oranges rotten.   The libel, after setting out the conditions of a charter-party executed between the libelant and the owners, avers that the steam-ship at the time she received the oranges was so stiff and deep in the water in consequence of cargo previously taken on that she was unseaworthy, unfit to encounter the weather of that season of the year, and rendered incapable of properly ventilating and caring for the cargo of fruit, and that the master and those navigating her failed to properly ventilate the same.   The answer denies any lack of proper ventilation "so far as the circumstances of the voyage would permit;" alleges that the libelant well knew the quantity of cargo on board before the loading of his cargo; denies that the steam-ship was overloaded; denies all negligence; alleges that the damage to the fruit, if any, was occasioned solely by unusually stormy weather and heavy seas, whereby the voyage was protracted, and the usual ventilation became impracticable; and insists that the loss was within an exception in the bill of lading exempting the steam-ship from liability.   An issue is made by the pleadings respecting the proper stowage of the libelant's cargo; but the ship was stowed by the libelant's stevedores, was properly stowed, and upon

the concessions of counsel at the hearing this issue is to be deemed eliminated from the case.

The proofs establish the following facts:

November 30, 1880, the Regulus then being in the Tyne, bound for Genoa, her owners entered into a charter-party at London with the libelant, conditioned that, "after loading her mineral at Elba for owner's benefit," she should proceed to Valencia, and load 4,400 cases of oranges for the libelant, "not above what she could reasonably stow and carry, above her tackle, apparel, provisions, and furniture," and being so loaded should proceed to New York. It was also conditioned in the charter-party that the hatches should be taken off "whenever practicable, as usual for ventilation of green fruit." After leaving Genoa the ship proceeded to Elba and took on 1,243 tons of mineral ore, the master giving notice by telegram to the libelant, December 23d, that she would sail that night for Valencia. She arrived there, January 1st. In the mean time the libelant had directed his oranges to be packed, boxed, and brought in from the country ready for shipment. January 5th, a bill of lading was executed between the libelant and the master containing a clause exempting the owners from liability from loss from all accidents of navigation and from negligence or default of master, mariners, or others. When she arrived at Valencia the steam-ship had on board 60 tons of coal, besides the 1,243 tons of ore taken on at Elba. Her carrying capacity was 2,000 tons. The libelant, who had been a ship captain and was familiar with the contingencies of the voyage and the conditions of safety for his fruit, objected to the master that the ship was too deeply loaded, and suggested that with bad weather the hatches would have to be battened down, and the fruit could not be properly ventilated. The master dissented from this view, and the libelant delivered the oranges, 4,326 cases, weighing about 300 tons. After the cargo had been delivered the libelant was informed that the ship would coal at Gibraltar. This had not been understood by him before; it was not contemplated by the terms of the bill of lading, and there was no uniform custom on the part of vessels coming from England to do so, although fruiterers generally on a voyage from the Mediterranean to New York were accustomed to coal there. The steam-ship left Valencia, January 7th, and proceeded to Gibraltar where on the 10th she took on 300 tons of coal. On January 11th she left there for New York. When she left Gibraltar her draught of water aft was 19 feet 6 inches, and forward was 17 feet 4 inches, a mean draught of 18 feet 5 inches. She carried a Plimsoll mark, according to the provisions of English acts of parliament, which is a disk one foot in diameter with a line drawn horizontally through the center, painted on the outside of the vessel amid-ship. The center line fixes the point beyond which according to the judgment of the owner the vessel is not to be loaded deeper. When she left Gibraltar her water or load line was about 10 inches below the center line of the Plimsoll mark, and she had 4 feet 4 inches of free-board.

According to Lloyd's rules, however, the utmost mean draught of water which she could have, consistently with safety to herself and any cargo, was 18 feet 5$\frac{1}{2}$ inches, and a free-board amid-ship of not less than 4 feet 5$\frac{3}{8}$ inches. Vessels carrying fruit customarily allow a free-board of a couple of feet more than the free-board for ordinary cargo in order that the hatches can be opened without danger from water to secure the necessary ventilation of the fruit and prevent it from heating. The coal taken on at Gibraltar increased her draught something over a foot, but when she left Valencia it is safe to assume she drew at least a foot more water than was customary, in view of the cargo she was to carry and the reasonable contingencies of the voyage. The steam-ship was provided with the ordinary facilities for ventilation, and in addition with booby hatches such as are usually provided for the ventilation

of fruit cargoes, and which were constructed under the supervision of libelant at Valencia. These booby hatches were built at the after-part of the holds, Nos. 2 and 5, in which the oranges were stowed. After leaving Gibraltar the steam-ship met with unusually tempestuous weather and heavy seas, which lasted with occasional intermissions of a day or two at a time until she arrived at New York, February 9th. On January 12th one of the booby hatches was carried away by the seas, and on the 13th the other was carried away. After that the hatches were covered with tarpaulins, and were opened for ventilation from time to time, and wind-sails were used for that purpose; but owing to the heavy seas constantly shipped by the steamer the hatches were not kept open sufficiently for the proper ventilation of the oranges. The voyage of the ship was protracted 10 or 12 days beyond the usual time required by reason of the heavy gales and seas she encountered, and because in consequence of being so deeply laden she was obliged materially to decrease her speed.

When the oranges were delivered on board they were in good condition for shipment, and with proper ventilation would have arrived in good condition notwithstanding the length of the voyage. When the ship left Gibraltar she was too deeply laden by two or three feet to carry her cargo of oranges with a due regard to necessary ventilation in case of encountering heavy seas. Her trim was gradually lightened as she consumed her coal, but when she arrived at New York her draught of water aft was 18 feet 10 inches. If she had had two more feet of free-board she would not have shipped such heavy seas, and it would have been practicable to open her hatches oftener and ventilate her fruit more efficiently than was done. Two other steam-ships, the Navigation and the Rossend Castle, left Gibraltar about the same time she did; the Navigation bound for Boston, and the Rossend Castle for New York. They encountered the same weather, substantially, as did the Regulus, but were able efficiently to ventilate their cargoes of oranges and deliver them in good order. The Navigation sailed from Gibraltar, January 10th, and arrived at Boston, February 1st. Her voyage was protracted about three days by the very exceptional weather she met with. Her booby hatches were carried away by the heavy seas. She carried a clear side of seven feet, and shipped a great deal of water during the passage; but, although a large part of the time she was unable to take off her hatches, she managed to keep the lee corners open for ventilation. Owing to the want of sufficient ventilation the libelant's oranges became heated upon the voyage and rotted, whereby he sustained a loss in the sum of $10,144.99, which sum represents the difference between the amount realized by the sale of the oranges at public auction in New York, January 10, 1881, and the amount he would have realized over the current prices at that time if the oranges had arrived in good condition.

In considering the proofs, the question which has presented the most difficulty is the one of fact, whether, in view of the severe weather encountered by the steam-ship, it would have been practicable, if she had not been overloaded, to keep the hatches open sufficiently for the ventilation of the fruit. No doubt is entertained that, with the usual free-board, the steam-ship would not have shipped such heavy seas, and that the hatches could have been opened more frequently than was practicable when she was loaded down almost to the limit of her draught. But the weather was extraordinary, and the doubt is whether, with two feet more of free-board, she would not still have been under the necessity of keeping her hatches closed so much of the time as to preclude the necessary ventilation. It is incumbent upon the libel-

ant to show affirmatively that the loss arose solely from the breach of the obligation of the charter-party; and he cannot prevail by raising a doubt upon this point. It does not help him that in such a case the evidence is almost wholly in the control of those in charge of the ship, and affords him a frail reliance in establishing fault on their part; but it is not unreasonable to hold that where it is shown that the ship disregarded the practice which experience had established, and which is therefore to be deemed essential to a discharge of her whole duty, that circumstance is *prima facie* sufficient to account for the result, and to shift upon the ship the burden of a satisfactory exculpation. Certainly the proofs are not convincing that the hatches could not have been opened efficiently for ventilation if the ship had been in light trim and carried the usual free-board. The result that followed was just what experience indicated as likely to follow in case of heavy seas. The log of the first officer is well calculated to convey the impression that the vessel had to contend with tremendous seas throughout nearly the entire voyage; but an analysis of the testimony of the master and of the first officer, and a comparison between this log and the engineer's log materially modifies this impression. For instance, the log (January 11th) has this entry: "Ship rolling heavily, and shipping quantities of water over all;" while the master, with the official log is his hand, says the first bad weather was on the 13th. The first officer also testifies that there was nothing extraordinary in the character of the wind or sea on the 11th. The fact that the Navigation encountered substantially the same perils with safety to her cargo, fortifies the theory that the loss is attributable to the fault of the ship rather than to the perils of the voyage.

The cause of action being founded on the breach of the charter-party the remaining question is whether the hatches were "taken off whenever practicable, as usual for ventilation of green fruit." This covenant obligated the ship to furnish the usual ventilation necessary for such cargoes to the extent which her facilities would permit. The hatches were to be taken off whenever practicable, in view of the facilities of the ship as they existed at the time the charter-party was executed and the vicissitudes of the voyage. It was not contemplated by the charter-party that the ship should be at liberty to carry other cargo of a character to cripple the ordinary ventilating facilities of the ship. The hatches may have been taken off to the extent practicable in view of the overloaded state of the ship on her voyage and the weather she encountered; but they were not taken off "as usual" because the overloaded condition of the ship rendered this impossible. The ship could not perform her contract with the libelant because those in charge had put it out of her power to do so. If there was negligence on the part of those in charge in not removing the hatches as often as they should have been, the ship is not exonerated by the exception in the bill of lading. Conceding that the contract is to be

interpreted and effectuated according to the law of England, (*Moore* v. *Harris*, L. R. 1 App. Cas. 318–332; *Woodley* v. *Michell*, L. R. 11 Q. B. Div. 51,) and that it was competent by the stipulation of the parties to exempt the ship from liability arising from the negligence of those in charge, yet that stipulation must give way to the expressed contract to take off the hatches whenever practicable. Both cannot stand together, and any doubtful question of construction should be resolved against the carrier. *Hayn* v. *Culliford*, L. R. 3 C. P. Div. 410; L. R. 4 C. P. Div. 182; *Taylor* v. *Liverpool*, L. R. 9 Q. B. 549.

It is insisted for the appellant that the libelant cannot recover because he knew the ship was overloaded when he delivered his cargo to her. If his cause of action was one for negligence it would be pertinent to inquire whether there was negligence on his part which contributed to the loss, and if so, whether the loss should fall upon him or be apportioned. There is no principle, however, which precludes one party from a recovery for the breach of an express contract because he had reason to suppose at the time the contract was made, or during the time it remains executory, that the other party could not perform. He has a right to rely upon the contract and to substitute the promise of the other party for his own fallibility of judgment.

In reaching the conclusion that the decree of the district court was right, the theory that the delay in the voyage which was attributable in part to the overloading of the ship contributed to the spoiling of the fruit has not been adopted. Possibly with a shorter voyage the lack of proper ventilation might not have been so injurious to the fruit; but this would seem to be conjectural merely; and when the oranges were shipped they were unripe and ought to have kept 40 or 50 days with ordinary care. The testimony introduced for the first time upon this appeal has not materially changed the case as made in the district court; and that which has been adduced to show that the oranges when shipped were unduly ripe is rejected as utterly unworthy of credit.

A decree is ordered for the libelant for $10,144.99, with interest from January 10, 1881, with the costs of the district court, and of this appeal.